IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SIMON DAVID HENDRICKSON                                    PLAINTIFF

V.                        CASE NO. 5:16-CV-05057

DETECTIVE JOHN SCHUSTER, Washington
County Sheriff's Office; SHERIFF TIM HELDER            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This is a civil rights case filed by Plaintiff Simon David Hendrickson under the provisions of 42 U.S.C. § 1983. Plaintiff contends that Defendants violated his constitutional rights by failing to protect him from attack by a fellow inmate, James Griffin, and then failing to follow up and investigate his sexual assault claim. Plaintiff also brings a supplemental state law claim under the Arkansas Civil Rights Act. Ark. Code Ann. § 16-123-101.

Defendants have filed a Motion for Summary Judgment (Doc. 31), and Plaintiff has filed a Response (Doc. 35). The Motion is now ready for decision.

### I. BACKGROUND

During all relevant time periods, Plaintiff was a pretrial detainee in the Washington County Detention Center ("WCDC"). Plaintiff was first booked in the WCDC on September 18, 2014. (Doc. 33-2 at 1-4). At the time, he was awaiting trial on rape (forcible fondling) and second-degree sexual assault charges. *Id.* at 4. When he was booked, he reported having Post Traumatic Stress Disorder, asthma, a cold, kidney stones, blood in his urine,

1

and pain in his back and legs. (Doc. 33-3 at 4). He reported being on various medications at that time, including Seroquel[1] and Fluoxetine.[2] (Doc. 33-3 at 4).

Initial housing assignments at the WCDC are made by booking officers. (Doc. 33-1 at 2). Thereafter, detention officers make the assignments based on the safety and security needs of the detainee and the facility, considering available housing options. *Id.* WCDC policy requires that inmates charged with sexual offenses be housed separately from other inmates, for the health and safety of all detainees at the jail. *Id.* In September and October of 2014, when Plaintiff entered WCDC custody, K-block was the designated area for housing sexual offenders. *Id.* In December of 2014, sexual offender inmates were moved to Q-block. *Id.* Plaintiff was placed in K-block just after he was booked. (Doc. 33-1 at 42; Doc. 33-6 at 1).

When detainees enter the WCDC, they are advised they will be disciplined if they engage in sexual activity in the jail. (Doc. 33-1 at 3). Various qualifying offenses that merit discipline are set forth in the WCDC Policy Manual (Doc. 33-8 at 12-28), including rape or other forced sexual acts, making sexual threats, engaging in sexual activity with another consenting person, making sexual proposals, and indecent exposure. According to Defendants, by way of the kiosk,[3] detainees are informed that there is a "zero tolerance

---

[1] Seroquel is a brand name for the medication Quetiapine. Quetiapine is used to treat symptoms of schizophrenia, episodes of mania or depression in patients with bipolar disorder and depression. https://medlineplus.gov/druginfo/meds/a698019.html (accessed March 6, 2018).

[2] Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. https://medlineplus.gov/druginfo/meds/a689006.html (accessed March 6, 2018).

[3] Inmates have access to an electronic kiosk that contains information about WCDC policies, as well as instructions for submitting electronic grievances and medical requests.

policy" for sexual offenses within the facility. (Doc. 33-1 at 4; Doc. 33-10 at 1). According to Defendants, the kiosk contains a flyer that describes the ways in which a detainee may report sexual offenses. Such offenses are commonly referred to in the jail as "PREA" offenses. PREA stands for "Prison Rape Elimination Act," which is codified at 34 U.S.C. § 30301, *et seq.*

In October of 2014, Plaintiff was moved between administrative segregation and various cell blocks a number of times. (Doc. 33-6 at 1-2). On October 22, 2014, he was returned to K-block. *Id.* at 2. On October 23, 2014, Plaintiff's alleged rapist, Griffin, was arrested and taken into custody at the WCDC on charges that included aggravated assault and sexual assault in the second degree. (Doc. 33-7 at 1). He was assigned to K-block. *Id.* at 2; *see also* Doc. 34 at 2.

On December 6, 2014, Plaintiff was moved to Q-block, where sex offenders were being housed at the WCDC at that time. (Doc. 33-6 at 3). On December 9, 2014, Griffin was moved from administrative segregation to Q-block. (Doc. 33-7 at 4). Then, on December 31, 2014, Plaintiff was moved to administrative segregation, L-block. (Doc. 33-6 at 4). Detainees in L-block were locked down 23 hours a day. (Doc. 33-11 at 44). On January 11 and 12, 2015, Plaintiff asked to be placed in the open barracks, or else back in his original pod, Q-block. (Doc. 33-5 at 4). Plaintiff was ultimately returned back to Q-block. (Doc. 33-6 at 4).

On or about February 10, 2015,[4] Plaintiff testified that he was in a cell in Q-block with three other inmates, including Griffin. (Doc. 33-11 at 48-49 & 60). According to Plaintiff, Griffin was actually assigned to a different cell but had entered Plaintiff's cell during lights-out because he was playing cards with one of Plaintiff's cellmates. (Doc. 33-11 at 51). Plaintiff testified that he complained to a guard, whose name he could not remember, about Griffin being in his cell, and the guard replied: "Shut up. You're all in the same place. Get over it. I've got things to do." Id. at 51-52.

Plaintiff then testified that he went to sleep that night on his stomach with his pants up and a blanket on him. (Doc. 33-11 at 49 & 72). He woke up with Griffin on top of him holding something sharp[5] to his throat, no blanket on him, and his pants down past his "butt." Id. at 48 & 71-72. Plaintiff testified that his pants were baggy and that detainees did not have underwear. Id. at 71. According to Plaintiff, Griffin said, "You're going to do what I tell you to do or I'm going to cut your head off." Id. at 48-49. Plaintiff tried to fight off Griffin and started to yell and scream. Id. at 49. As soon as Griffin "entered him," Plaintiff was able to throw Griffin off him to the floor. Id. at 50.

Plaintiff testified that Griffin got on the rail of the bottom bunk and "grab[bed] me again, grab[bed] me by my genitalia and the back of my pants . . . and started pulling me off and [said] 'we're going to handle this down here where I can move around.'" Id. at 52.

---

[4] Plaintiff initially testified the incident occurred the evening of February 7, 2015, a Saturday, and the early morning hours of February 8, 2015. Plaintiff testified later in his deposition that he believed the assault occurred on a Sunday night, which would have been February 8, 2015, and the early morning hours of Monday, February 9, 2015. (Doc. 33-11 at 65). Plaintiff also testified that he believed he may have been mistaken about the dates and that it could have happened on or around February 10, 2015. Id. at 104.

[5] Plaintiff testified that he later learned Griffin had been holding a comb to his neck. (Doc. 33-11 at 72).

4

Plaintiff jumped down, and at that time Plaintiff's cellmate yelled at Griffin "to get away from here." *Id.* Plaintiff started beating on the door to get the guard's attention. *Id.* According to Plaintiff, a guard he could not identify by name came to the door and said, "I ain't in here for no lovers quarrel," scanned the tag on the door, and then left. *Id.*

Plaintiff testified that a different guard, believed to be named Bonito, unlocked the cell for breakfast. *Id.* at 53. Plaintiff threw Griffin's belongings out of the cell and then told the guard what had happened. Plaintiff was told to submit a kiosk request about the incident. *Id.* Plaintiff testified that the guard jokingly asked him if he had enjoyed it. *Id.* Later, when Plaintiff tried to submit a incident report through the kisok, Griffin stood in front of the kiosk blocking access to it. *Id.* Griffin told Plaintiff that he already knew Plaintiff was a snitch because he had told the guard what had happened. *Id.* at 54. Plaintiff testified that at around lunchtime, he asked an officer and the jail nurse if he could talk to someone about the incident because Griffin would not allow him to access the kiosk. *Id.* Nothing happened, so Plaintiff asked another officer for help, and that officer told Plaintiff he would let someone know that Plaintiff could not access the computer. *Id.* Later that same day, Plaintiff's cellmate, whom Plaintiff believed was a witness to the sexual assault, was transferred to Benton County. *Id.* Plaintiff testified that the transfer happened on a Monday. *Id.*

Plaintiff further testified that he obtained access to the kiosk either the night after the assault or the following night. *Id.* He did not include much detail in his kiosk entry because other inmates were sitting nearby. *Id.* Plaintiff estimated that he was seen by a detective within a day or two of his kiosk complaint. *Id.* He also asked to see the doctor after the assault happened. *Id.* at 47, 84. He testified that he was bleeding every time he

5

went to the bathroom and had sores on his "bottom." *Id.* at 48, 84. Plaintiff testified that he could not recall if he put his request for medical treatment on the kiosk or simply talked to the nurse about his concerns when she brought him his regular medication. *Id.* at 85. He testified, however, that he told the nurse several times that he was bleeding when he passed stool. *Id.* at 84-85. Kiosk transcripts submitted to the Court by Defendants indicate that Plaintiff reported to nursing staff, via a kiosk request, that he was suffering from hemorrhoids in late January. *See* Doc. 33-5, p. 5. On February 9, 2015, around the time of the alleged sexual assault, he was seen by the nurse for complaints about indigestion and was placed on a "bland/veggie" diet for 30 days. (Doc. 33-3 at 9). The nurse's February 9 report contained no mention of bloody stool or Plaintiff's report of a sexual assault, and instead noted only Plaintiff's nausea and yellow stool. *Id.*

On February 10, 2015, Plaintiff submitted an inmate request that stated: "I was proprazitioned [sic] for gay sex by Griffin at 2am Tuesday Morning. My witness is Jim Cain my cellmate and I am willing to take a polygraph to show our truth on this matter, or I can also let my lawyer know also when he arrives this week." (Doc. 33-5 at 6). During his deposition, Plaintiff could not recall using this language. (Doc. 33-11 at 64). He believed instead that he had reported being sexually assaulted—not propositioned—by James Griffin. *Id.* During the deposition, however, when Defendants' counsel questioned Plaintiff as to why he never mentioned in the kiosk request that he had actually been raped, Plaintiff responded that he had been waiting to tell his attorney the whole story.

Also on February 10, Plaintiff was moved to booking and then returned to Q-block. That same day, Griffin was moved to administrative segregation, L-block. Deputy Jonathan Brown filed an incident report about the Plaintiff's alleged sexual assault on

6

February 10. (Doc. 33-4 at 2). Deputy Brown indicated that he was notified by Plaintiff that Griffin had propositioned him for gay sex at 2 a.m. one morning. *Id.* at 3. According to Deputy Brown's report, Plaintiff told him that Griffin had woken him up by grabbing his penis and telling him that he wanted to have sex with Plaintiff. *Id.* The report continued as follows:

> Hendrickson told me that he told Griffin to leave him alone and to not touch him. He also told him that he wasn't that way, meaning homosexual. Hendrickson said that Griffin kept trying to get him to have sex with him. Hendrickson also said that he, (Griffin,) wanted to give him oral sex. Hendrickson said that he felt very uncomfortable. Hendrickson said that after this, Griffin went to sleep and no other contact or propositions were made. Hendrickson also said that a Detainee Cain (54yoa,) was also in the cell during this time and was a witness to everything that was taken place.

*Id.* Deputy Brown forwarded the report to the appropriate officers. *Id.* Griffin was then moved to booking so that he could be separated from Plaintiff in a different housing unit. *Id.*

Plaintiff's complaint was forwarded to Detective John Schuster, an investigator for the Washington County Sheriff's Office. Detective Schuster began working at the Sheriff's Office in this capacity in either 2012 or 2013. (Doc. 36-3 at 12-13). He believes that during his time as an investigator for Washington County, he investigated approximately six allegations of sexual assault at the WCDC. *Id.* He testified that out of the six allegations, none were ultimately substantiated. *Id.* at 14. Detective Schuster further testified that in each of the six cases, he interviewed the victim first, followed by the suspect, and then the witnesses. *Id.* at 17, 20-21. In every case except Plaintiff's, the victim immediately agreed to speak with Detective Schuster; however, for some reason, Plaintiff declined to speak to Detective Schuster without his attorney present. *Id.* at 14.

7

On February 11, 2015, Detective Schuster submitted a supplemental report to Deputy Brown's report. (Doc. 33-4 at 4- 7). According to the supplemental report, Detective Schuster began his interview with Plaintiff by reading him a statement-of-rights form. When Schuster arrived at the question on the form that asked whether Plaintiff wished to have his attorney present, Plaintiff responded that he did, in fact, wish to speak to his public defender, Robert Scott Parks, before he answered any further questions. *Id.* at 5; Doc. 33-13 at 14. Detective Schuster reminded Plaintiff that he was a victim and not a suspect. (Doc. 33-4 at 4-7). However, Plaintiff indicated that he had been told by his public defender never to speak with police or give an interview without talking to his attorney first. *Id.*; *see also* Doc. 33-11 at 55.

Detective Schuster testified in his deposition that he usually tells victims that the investigation is intended "to prove [the victim] correct," but that charges could later be brought against the victim if the victim lied or gave a false report of a sexual assault. (Doc. 36-3 at 48). In Detective Schuster's experience, inmates make false reports of sexual assaults for various reasons, including wanting to be moved to another cell block, or lying due to mental health issues. *Id.* at 48-49. In Plaintiff's case, he indicated to Schuster that he was sexually assaulted on Monday, February 9, at around 2 a.m., and he gave Schuster the names of witnesses. (Doc. 33-4 at 7). Detective Schuster ended the interview with Plaintiff by advising him that he would attempt to contact his public defender, Parks. *Id.* at 5. Schuster did not attempt to collect physical evidence from Plaintiff, nor dd he attempt to speak to Griffin, the accused rapist. Schuster testified that without knowing Plaintiff's exact accusations, he could not "confront [Griffin] without knowing what I'm trying to find out." (Doc. 36-3 at 29).

On the same afternoon as the initial interview with Plaintiff, Detective Schuster sent an e-mail to Plaintiff's attorney, Parks. In the email, Schuster told Parks that he had attempted to interview Plaintiff about an uninvited sexual assault, but that Plaintiff refused to speak to him without first consulting his attorney. (Doc. 33-4 at 6; Doc. 33-13 at 2). Parks replied in an email that he planned to see Plaintiff the following morning after court and asked if Plaintiff was "ok." (Doc. 33-4 at 6). Detective Schuster again replied in writing, letting Parks know that Plaintiff was fine and asking Parks to call him the following morning for more information. Id.

On February 11, 2015, Plaintiff asked a jail guard whether Detective Schuster had been able to communicate with his public defender. (Doc. 33-5 at 7). The officer replied that the public defender's office had been notified. Id. That same day, Plaintiff asked to call Detective Schuster about alleged retaliatory statements that were being made about Plaintiff by other inmates. Id. Sergeant Stanton noted that an e-mail was sent to Detective Schuster. Id.; Doc. 33-13 at 4. Then, on February 12, 2015, Detective Schuster sent a follow-up email to Parks. (Doc. 33-4 at 10; Doc. 33-13 at 5). Parks replied that he had not had time to go to the jail to visit Plaintiff, but that he would do so as soon as possible. Id. Detective Schuster then got in contact again with Plaintiff, and Plaintiff told Schuster that he had still not had an opportunity to speak to Parks. (Doc. 33-4 at 10; Doc. 33-13 at 8). Plaintiff confirmed that he was not willing to talk with Schuster about the sexual assault until he first spoke with Parks. In addition, Plaintiff was worried about being harassed by other inmates who were calling him a snitch. Id. Detective Schuster immediately notified Corporal Tom Mulvaney that Plaintiff had been threatened by other inmates. (Doc. 33-13 at 8). That same day, February 12, Plaintiff was moved to administrative segregation, L-

9

block, for his own protection. (Doc. 33-4 at 8). Plaintiff remained in L-block until May 12, 2015, when he was moved to W-block. (Doc. 33-6 at 7).

On February 17, 2015, Plaintiff made a kiosk request, asking whether Detective Schuster had spoken to Plaintiff's attorney yet. (Doc. 33-5 at 8). Corporal Mulvaney responded in writing that he would let Detective Schuster know that Plaintiff wanted to speak to him. *Id.* On February 18, 2015, Detective Schuster made a note in his file that the investigation was currently inactive due to attorney Parks not contacting either him or Plaintiff. (Doc. 33-4 at 10; Doc. 36-3 at 44-45). There is no indication in the record that Detective Schuster spoke to Plaintiff that day.

Plaintiff testified that he then sent three follow-up letters to Detective Schuster. He claims the first one was handed to jail staff on February 18, the second one was submitted about two weeks later, and the third one was submitted about two weeks after that. (Doc. 33-11 at 79, 80). Plaintiff claimed that he told Schuster in these three letters that he had not yet heard from his attorney and did not know what was going on with the investigation. *Id.; see also* Doc. 33-13 at 10-11 (undated letter to Detective Schuster). On February 23, 2015, Plaintiff submitted a medical request stating he had blisters between his "sack and anus" and asked to see the doctor. (Doc. 33-5 at 9). Plaintiff was added to nurse call. *Id.* Plaintiff testified that he was eventually seen by the doctor. (Doc. 33-11 at 108-09). He told the doctor that there had been an incident with a "guy [who] put his penis in me." *Id.* The doctor asked if he had reported it, and Plaintiff responded that he had. *Id.* Plaintiff was also concerned that this incident was the cause of rectal bleeding. *Id.*

On March 9, 2015, Detective Schuster sent an e-mail to Parks noting that he had still not heard from him. (Doc. 33-13 at 12). Detective Schuster noted in the email that his

10

interview with Plaintiff was currently on hold because of Plaintiff's request to speak with Parks first. *Id.* On March 12, 2015, Detective Schuster submitted a supplemental report that noted his failed attempt to interview Plaintiff's cellmate about the sexual assault complaint. (Doc. 33-4 at 11). Detective Schuster reported that the cellmate did not want to provide an official interview because he was afraid he would be harassed by other inmates if they found out he had cooperated with the investigation. *Id.* The cellmate indicated that he might be willing to provide a statement before his transport to federal prison, which he believed would occur around April 1, 2015. *Id.* Detective Schuster testified in his deposition that it was not unusual for a detainee witness to refuse to give a statement, since detainees seem to "have a code not to speak to the police." (Doc. 36-3 at 29).

Detective Schuster indicated in the March 12 report that he was going "to have booking place a notice" in the cellmate's file so that Schuster would be contacted when the cellmate was ready to be transferred to federal custody. (Doc. 33-4 at 11); *see also* Doc. 36-3 at 24, 26-27. Detective Schuster could not recall that he was ever contacted when the cellmate was transferred. (Doc. 36-3 at 27). He testified, however, that it is not uncommon for "them to not contact me." *Id.* Detective Schuster made no attempt to contact any other witness that Plaintiff had identified. *Id.* at 28.

Plaintiff testified that not only was his cellmate never interviewed, but that the jail placed the cellmate in the same cell with Griffin shortly after the attack on Plaintiff. (Doc. 33-11 at 56). Plaintiff testified that Griffin beat the "living daylights" out of Plaintiff's former cellmate. *Id.* According to Plaintiff, this beating occurred the same day Plaintiff was moved to L-block. *Id.*

11

On April 7, 2015, Plaintiff submitted a request to speak with Detective Schuster as soon as possible. (Doc. 33-5 at 10). Corporal Mulvaney responded to Plaintiff that an e-mail had been sent, but that it was up to Detective Schuster to get in contact with Plaintiff. *Id.* On April 10, 2017, Griffin was released from the WCDC. (Doc. 34 at 1).

In mid-April, Plaintiff finally spoke with Parks, his attorney. (Doc. 33-11 at 80). Plaintiff advised Parks what was going on in the sexual assault investigation, and he handed Parks some notes. *Id.* According to Plaintiff, Parks said he would discuss the matter with the prosecutor. *Id.* Plaintiff also testified that Parks assured Plaintiff it was not necessary for an attorney to be present for the interview with Detective Schuster. *Id.* at 80-81. Plaintiff then tried to contact Detective Schuster by handing a jail officer a letter marked "Detective John Schuster." *Id.* at 81. The officer told Plaintiff he would send an e-mail to Detective Schuster. *Id.* Plaintiff tried one other time, about the first week in May, to contact Detective Schuster by sending a letter to the address noted on Schuster's business card. (Doc. 33-11 at 83). Plaintiff testified that the letter stated exactly what had happened to him during the sexual assault. *Id.*

Detective Schuster testified that Plaintiff contacted him on two other occasions after the initial face-to-face interview, but Plaintiff never asked to speak with Schuster about the details of the sexual assault. (Doc. 36-3, pp. 22-23). According to Schuster, Plaintiff contacted him the first time to let him know that he was being harassed by inmates in his housing block; and Plaintiff contacted him a second time to let him know that he needed a second mat due to back surgery. Schuster claims that in response to Plaintiff's first letter, Schuster referred the harassment issue to WCDC officials, who promptly moved Plaintiff to administrative segregation for his own protection. In response to the second

12

letter, Schuster claims that he contacted the jail nurse and "had them check and respond in writing what they were going to do [about the mat request]. . . ." *Id.* at 23. Detective Schuster testified that it was his impression that he was not authorized to speak to Plaintiff concerning the sexual assault until after Plaintiff's attorney approved the contact and communicated directly with Schuster. *Id.* at 24. In Schuster's mind, it would not have been appropriate to check in with Plaintiff periodically to see if he had changed his mind about talking about the incident. *Id.* In particular, Schuster thought: "I can't go to him and say[,] you change your mind yet, you want to talk to me? I can't do that." *Id.*

On July 16, 2015, Plaintiff was released from isolation and placed into "D Cell population." (Doc. 33-4 at 18). A note was made in his file that he could be placed in any population that the staff deemed appropriate. *Id.* On September 4, 2015, Plaintiff was transported to the Arkansas Department Correction ("ADC"). (Doc. 33-2 at 5).

Plaintiff testified that his claim against Detective Schuster is based on his failure to follow up on the sexual assault investigation. (Doc. 33-11 at 95). Plaintiff specifically faults Detective Schuster for failing to investigate further after Parks, Plaintiff's attorney, told Plaintiff that it was not necessary for an attorney to be present during the interview. *Id.* Also, in Plaintiff's opinion, Griffin should not have been housed with other inmates in the first place because he had a track record of violent behavior. *Id.* at 89. Plaintiff indicated that Griffin had an altercation with another inmate in January of 2015 and broke the inmate's nose. *Id.* at 90. Plaintiff also testified that Griffin liked to fight and provoke officers. *Id.* at 91. Prior to the sexual assault incident, though, Plaintiff agreed that he did not have any problems with Griffin. *Id.* at 90.

13

Plaintiff also agreed in his deposition that he never discussed the sexual assault with Sheriff Helder. *Id.* at 87. He named Sheriff Helder as a Defendant in this action because the Sheriff is responsible for writing the jail's policies, and Plaintiff believes there should have been a policy in place that required jail staff to perform medical examinations on sexual assault victims. *Id.* at 87-88. Plaintiff also believes the jail should have investigated the situation differently by collecting physical evidence of the assault. *Id.* at 88.

Sheriff Helder responds in an affidavit that he relies on his chain of command to administer jail operations, and that he was not personally involved in any housing decisions for either Plaintiff or Griffin. (Doc. 33-12 at 1). Sheriff Helder also asserts that he was not involved in, or aware of, any of the incidents referenced in the Complaint until he was served in this case. *Id.* at 1-2. Further, he states that "[d]uring the years of 2014 or 2015, I was not aware of any instances of wrongdoing which lead me to conclude that additional training, policies, or supervision were necessary in the Washington County Detention Center related to the housing of detainees accused of sex offenses." *Id.* at 2.

With respect to Plaintiff's official-policy claim, Plaintiff testified in his deposition that the jail's officers were not properly performing cell checks. (Doc. 33-11 at 92). According to Plaintiff, some officers would just scan the cell doors but not look inside, while other officers would shine a light into the cells and ask if everything was all right. *Id.* Plaintiff believed the officers should instead wake the detainees for cell checks to make sure that they were actually all right. *Id.* at 94. Plaintiff believes that his injury was caused at least in part by the jail officers' failure to perform a thorough cell check. *Id.* at 92. On the night in question, Plaintiff testified that normal cell checks were not performed, and "[the officer]

14

[was instead trying to] just get out of there as quick as possible." *Id.* at 94. Plaintiff acknowledged, however, that the jail's normal practice was to check cells every two hours. *Id.*

According to Corporal Mulvaney's affidavit, officers are required to perform regular cell checks both visually, through the use of monitored cameras, and in person, by going into the housing areas. (Doc. 33-1 at 3-4). Officers perform a visual inspection of each cell area and each detainee each hour. *Id.* According to Corporal Mulvaney, "[b]ecause of the close proximity of the housing areas to pod control, the sound of someone shouting or banging on a door in an emergency is easily heard in the pod control area and allows personnel to respond quickly." *Id.* at 4.

Lieutenant Chris Reeser testified that the WCDC utilizes an inmate classification system that ranks inmates based on criminal history, current charges, and in-custody behavior. (Doc. 36-2 at 11). If an inmate is charged with a sexual offense, they are housed in a different area. *Id.* Within the block, inmates are classified by threat level as minimum, medium, and maximum. *Id.* at 11. If necessary, "minimums" may be housed with "mediums," "mediums" and "maximums" may be housed together, but "minimums" and "maximums" may not be housed together. *Id.* The classification of an inmate as minimum level is reviewed every 90 days. *Id.* at 30. Inmates classified as medium or maximum levels are reviewed every 30 days. *Id.* Within the group of inmates classified generally as sex offenders, there are no additional procedures in place to determine potential danger to other inmates. *Id.* at 12. No distinction is made between pretrial detainees and convicted inmates in housing designation decisions. *Id.* at 33.

15

Lieutenant Reeser further testified that the WCDC has a zero tolerance policy for sexual assault or harassment. (Doc. 36-2 at 9). There is a flyer on the kiosk in every housing area that states this policy. *Id.* The flyer advises inmates that they can report sexual assault or harassment to a staff member, chaplain, GED instructor, medical staff, a rape crisis number, or in writing. *Id.* According to Reeser, if a sexual assault report is made, it is looked into, and if it appears there may have been inappropriate touching or abuse between individuals, the matter is turned over to the criminal investigation division. *Id.* at 10.

Lieutenant Reeser testified that Siegel Bell was the PREA coordinator at the time Detective Schuster was investigating Plaintiff's sexual assault claim. *Id.* at 21. Lieutenant Reeser became the PREA coordinator in January of 2016. *Id.* at 6. To the best of his knowledge, the PREA guidelines were the same in both 2015 and 2016. *Id.* at 15. Lieutenant Reeser claims that he never spoke to Bell regarding Plaintiff's case. *Id.* at 21. Lieutenant Reeser also did not know when Washington County had adopted the PREA standards. *Id.* at 15. He testified that PREA is merely a guideline—a minimum standard. *Id.* at 14-15. Lieutenant Reeser did not know whether any policies or procedures that the WCDC had implemented went beyond the requirements of PREA. *Id.* at 42. He testified that the WCDC was currently auditing its methods for PREA compliance. *Id.* at 15-16.

The WCDC distributes a booklet to all staff members that contains materials about sexual abuse. *Id.* at 17. The booklet indicates that all complaints of abuse or harassment will be investigated, and that the investigations will then be reviewed by the PREA board, which will include the detention administrator, detention captain, enforcement captain, and PREA coordinator. *Id.* at 20. Lieutenant Reeser testified that there was not currently a

16

PREA review board in place, and that he has never been part of a review board. *Id.* at 20-21. Lieutenant Reeser further testified that during his time as PREA coordinator, he never submitted any records, reports, or documents to any other agency for compliance review. *Id.* at 25.

Turning to the issue of Plaintiff's claimed injuries, he asserts that the sexual assault he suffered at the WCDC caused him both physical and mental damage, including open rectal sores, urinary problems, fear of strangers, flashbacks, nightmares, and paranoia. Plaintiff testified that since his "ordeal" at the WCDC, he has had problems urinating properly due to his prostate not relaxing sufficiently. (Doc. 33-11 at 25). Plaintiff testified that a doctor told him once that "trauma to your prostate might enlarge it to where you have trouble urinating on your own." *Id.* at 100. However, Plaintiff has never been diagnosed with prostate trauma. *Id.* at 101.

With respect to his mental health issues, Plaintiff testified that he attributed his recurrent feelings of anxiety, nervousness around people, and panic attacks to the sexual assault. *Id.* at 105. Plaintiff indicated that he was now taking less medication at the ADC than he did at the WCDC, but that he saw the psychiatric nurse at the ADC every 90 days and the psychiatrist every 30-45 days. *Id.* at 101.

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a

17

sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* at 610 (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Defendants contend they are entitled to summary judgment for the following reasons: (1) there is no proof of any personal involvement of Sheriff Helder or Detective Schuster in the housing or classification decisions related to Plaintiff or Griffin; (2) Plaintiff was housed appropriately and according to policy; (3) neither Sheriff Helder nor Detective Schuster failed to protect Plaintiff; (4) there is no constitutional right to an investigation or the filing of criminal charges; (5) there is no private right of action for a violation of the PREA; (6) Defendants are entitled to qualified immunity; (7) there is no basis for punitive damages; and (8) there is no basis for official-capacity liability.

Plaintiff agrees with Defendants that at least some of his claims merit dismissal. First, Plaintiff does not attempt to make any argument that there is a private right of action under PREA, as indeed, no private right of action exists. *See Bowens v. Wetzel*, 674 F. App'x 133, 137 (3rd Cir. 2017) (unpublished opinion) ("Bowens may not attempt to enforce statutes or policies that do not themselves create a private right of action by bootstrapping such standards into a constitutional deliberate indifference claim."); *Krieg v. Steele*, 599 F. App'x 231, 232-33 (5th Cir. 2015) (per curiam) (finding that the PREA does not afford a private right of action). Next, Plaintiff concedes that, as a matter of law, he cannot sustain any personal-capacity claims against either Sheriff Helder or Detective Schuster. *See* Doc. 35 at 5 n.1. Accordingly, the Court will dismiss all personal-capacity claims against Helder and Schuster, which leaves only Plaintiff's official-capacity claims against Washington County, by and through Sheriff Helder, for resolution. With respect to the official-capacity claim, Plaintiff contends that, although the WCDC maintains that it takes sexual-assault prevention seriously, its policies and procedures demonstrate deliberate indifference. *Id.* at 2. First, Plaintiff takes issue with Washington County's housing policy concerning sex offenders. He believes the jail should not simply house all sex offenders together, but should undertake a case-by-case analysis to consider whether, within the sex offender population of the jail, certain inmates may be at greater risk of sexual assault by other inmates due to the nature of their alleged crimes and/or due to their mental health histories. He further believes that sex-offender inmates at special risk of harm should be further segregated from certain "violent sex offenders." *Id.* at 7. Finally, Plaintiff argues that the County's deliberate indifference to sexual assault in the jail is evident, considering

19

the lack of meaningful investigation that took place following Plaintiff's sexual assault complaint. Defendant Schuster, the investigator on the case,

> presented the victim with *Miranda* rights; did not interview witnesses; did not interview the aggressor; did interview the individual performing hourly checks in Q block; did not review camera footage; tested no physical evidence; and did not speak to medical staff or request any examination.

*Id.* at 7-8.

"Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Holden v. Hirner*, 663 F.3d 336, 340-341 (8th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). The claims of pretrial detainees are analyzed under the Due Process Clause of the Fourteenth Amendment, rather than the prohibition of cruel and unusual punishments contained in the Eighth Amendment. *Id.* at 341. "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).

To prove a failure-to-protect claim, Plaintiff must show: "(1) an objectively, sufficiently serious deprivation, meaning that he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that the defendant was deliberately indifferent to the substantial risk of serious harm." *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010) (internal quotation marks and citation omitted). The subjective component[6] is

---

[6] *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015), is a case involving an excessive force claim brought by a pretrial detainee. The Court held that the pretrial detainee was only required to show that the force used was objectively unreasonable and that it was inappropriate to add a subjective standard for determining excessiveness. The Court held that a "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Some courts have applied *Kingsley* to other types of cases brought by pretrial detainees. *See, e.g., Castro v. Cnty. of Los Angeles*, 833 F.3d

satisfied if the defendant is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.*

As for official-capacity claims, they are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, official-capacity claims are treated as claims against Washington County. *See Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010). "[I]t is well established that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1214 (8th Cir. 2013) (internal quotation omitted). Therefore, to establish Washington County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir. 2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir. 1992) ("A public entity or supervisory official may be

1060, 1069 (9th Cir. 2016) (en banc) (applying *Kingsley*'s objective standard to a failure to protect claim*), cert. denied*, 137 S. Ct. 831 (2017); *but see Ryan v. Armstrong*, 850 F.3d 419, 425 n.3 (8th Cir. 2017) (acknowledging the holding of *Kingsley* but concluding that "even if subjective analysis of these claims is still warranted we conclude the district court erred in granting summary judgment"); *Bailey v. Feltman*, 810 F.3d 589, 593 (8th Cir. 2016) (in discussing a denial of medical care claim brought by an arrestee, the court acknowledged the existence of *Kingsley*, but found it unnecessary to address the proper constitutional standard).

held liable under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir. 2007).

*Id*. at 817-18.

"[A] custom can be shown only by adducing evidence of a 'continuing, widespread, persistent pattern of unconstitutional misconduct.'" *Jenkins v. Cnty. of Hennepin*, 557 F.3d 628, 634 (8th Cir. 2009) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). In *Mettler*, the Eighth Circuit set forth the requirements to prove that a municipal custom exists. These requirements are:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.,* [proof] that the custom was the moving force behind the constitutional violation.

*Mettler*, 165 F.3d at 1204 (quoting *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (alterations in original)).

Beginning first with Plaintiff's argument that WCDC's housing policy displays deliberate indifference to a substantial risk of serious harm, Plaintiff argues that because he was held in custody on a charge of sexually assaulting his minor children, he was at special risk of being sexually assaulted by other inmates, and the WCDC should have taken that fact into account when housing him with other sex offenders. According to Plaintiff, who quoted *United States v. D.W.*, 198 F. Supp. 3d 18 (E.D.N.Y. 2016), those

22

accused of sex offenses against children are at the "bottom of the 'prison hierarchy' and susceptible to both physical and sexual abuse from staff and inmates." *Id.* at 73. Plaintiff also contends that he was at additional risk of sexual assault at the WCDC due to his mental health struggles. *Id.* at 74.[7]

Having considered the entire summary judgment record, the Court finds there is insufficient evidence to establish a genuine issue of material fact as to whether there was a continuing, widespread, persistent pattern of unconstitutional conduct by Washington County and/or its employees in failing to further segregate individuals within the sex offender population, given that the WCDC already had a policy of separating sex-offender inmates from non-sex-offender inmates. In Plaintiff's particular case, there is no evidence that the WCDC or any of its employees were deliberately indifferent to a specific threat of harm made against Plaintiff by any inmate, or that any policy of the WCDC created a risk of harm. There is no evidence to suggest that Griffin targeted Plaintiff because of the nature of Plaintiff's pending criminal charges or because Plaintiff suffered from a mental illness. There is also no evidence that other detainees placed in the sex offender block with Plaintiff were targeted for those reasons. Further, there is no evidence suggesting there is a higher incidence of sexual assault in the sex offender block, or that sexual offenders who have also been charged with other violent crimes, such as assault and battery, are more likely to sexually assault their fellow detainees. It is undisputed that Washington County has a written "zero tolerance policy" that makes sexual conduct in the

---

[7] As previously stated, *see supra* n.1-2, Plaintiff was already taking the anti-psychotic drug Seroquel and the anti-depression/anxiety drug Fluoxetine at the time he was initially booked into the WCDC.

WCDC subject to disciplinary action and/or the imposition of criminal charges. Plaintiff cannot establish any facts to show that the WCDC disregarded a known, excessive risk of serious harm to Plaintiff's safety by following its housing assignment policy, which mandated that sex offenders be separated from non-sex offenders, and thereafter, that inmates be separated when they are the subject of actual or threatened violence.

As for the County's investigation of Plaintiff's sexual assault complaint, assuming as true Plaintiff's allegation that the County failed to adequately investigate the charge, such a failure to investigate cannot, in and of itself, support a § 1983 claim for failure to protect—or for any other constitutional claim the Court is aware of. *See, e.g., Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002) (finding that the plaintiff had no substantive or procedural right to an internal investigation of her claim of police brutality); *Jacoby v. PREA Coordinator*, 2017 WL 2962858, *4-5 (N.D. Ala. Apr. 4, 2017) (holding that an alleged failure to investigate the plaintiff's allegations of being held hostage, beaten, and raped by other inmates, combined with a failure to properly collect evidence and comply with PREA's requirements, were insufficient to state any constitutional violations).

In *Jacoby v. PREA Coordinator*, a case involving sexual assault allegations in a jail, the district court noted that "[t]he Constitution does not require officials to investigate or otherwise correct wrongdoing after it has happened." 2017 WL 2962858, at *5. The court therefore concluded that the jail's alleged failure to investigate or to "follow PREA investigation regulations did not contribute to the sexual assault of the Plaintiff." *Id.* Similarly, Plaintiff in the instant case cannot sustain an official-capacity claim against the County because there is no private right of action under PREA for failure to investigate a sexual assault claim; and the Constitution does not confer a right to such an investigation

24

either.  As no facts establish that Washington County had a custom, policy, or practice of failing to protect sexual offenders from attack by other sexual offenders, Plaintiff's official-capacity claim based on a failure to protect is dismissed.

## IV.  CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. 31) is **GRANTED** and all § 1983 claims are **DISMISSED WITH PREJUDICE.**  Having dismissed all federal claims, the Court declines to retain jurisdiction over the supplemental state law claim under the Arkansas Civil Rights Act, and it will be **DISMISSED WITHOUT PREJUDICE**.  28 U.S.C. § 1367(c)(3).

**IT IS SO ORDERED** on this _2nd_ day of April, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE